IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHANEANE DAVIS-JACKSON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 18-2822 |
| AMERICAN AIRLINES, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

In this action, Plaintiff Shaneane Davis-Jackson ("Davis-Jackson") asserts claims against her former employer, Defendant American Airlines, for employment discrimination and retaliation pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101-12213 ("ADA"), the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA"), and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17. Before this Court is American Airlines' Motion for Summary Judgment which seeks dismissal of all claims asserted by Davis-Jackson. For the reasons discussed below, the Motion will be granted.

## I.    FACTUAL BACKGROUND

The undisputed facts of record confirm that Davis-Jackson, an African American, began her employment as a Flight Attendant in 2008 for US Airways. Def.'s Statement of Undisputed Facts (Doc. No. 78-2) ¶ 11 [hereinafter "Def.'s Facts"]; Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. No. 79) at 1 [hereinafter "Pl.'s Resp."]. After US Airways and American Airlines merged in 2013, Davis-Jackson became employed by American Airlines as a Flight Attendant and was based at Philadelphia International Airport ("PHL"). Def.'s Facts ¶ 13. Although Davis-Jackson was based at PHL, she lived in Illinois. Id. ¶ 14; Pl.'s Resp. at 2.

From October 2016 through April 2017, Davis-Jackson was a Reserve Duty Flight Attendant.  Def.'s Facts ¶ 17.  Reserve Duty Flight Attendants are used to cover absences when another flight attendant is unable to report to duty so that American Airlines can comply with Federal Aviation Administration regulations regarding the minimum number of flight attendants for commercial flights.  Id. ¶ 20.  Each major hub, including PHL, has a group of flight attendants scheduled around the clock for reserve duty, called "Reserve Availability Period," or "RAP."  Id. ¶ 21.  There are three RAP shifts: 2:00 to 14:00; 6:00 to 18:00; and 14:00 to 2:00 the following day.[1]  Id. ¶ 22.  A Reserve Duty Flight Attendant is required to report to the crew room within two hours from the time at which the Reserve Duty Flight Attendant is notified of a pairing for a flight, unless the Reserve Duty Flight Attendant is instructed to proceed directly to the aircraft.  Id. ¶ 23; Dep. of S. Davis-Jackson (attached as Ex. D. to Def.'s Facts) at 37 [hereinafter "Davis-Jackson Dep."].  Reserve Duty Flight Attendants, like Davis-Jackson, are paid a monthly guarantee for reserve duty regardless of whether they are assigned to a trip.  Def.'s Facts ¶ 24.  If a Reserve Duty Flight Attendant is not properly positioned or available for reserve duty, he or she is deemed a "Reserve Not Positioned/Available for Duty," "Reserve Off Base," or "ROB."  Id. ¶ 27.  Pursuant to American Airlines' policy regarding Flight Attendant Dependability, "[a]ccepting credit for reserve duty for which a flight attendant is not positioned/available as requested will be addressed as both a dependability and work performance infraction."  Id. ¶¶ 29-30; Flight Attendant Dependability Flight Service (attached as Ex. F to Def.'s Facts).  As a Reserve Duty Flight Attendant, Davis-Jackson's supervisor was Linda Vosko ("Vosko"), a Flight Service Manager.  Def.'s Facts ¶ 16.

---

[1]   The Court will use military time throughout the opinion, as used by American Airlines in its briefing.

As an American Airlines employee, Davis-Jackson could fly free on American Airlines flights and received discounts on flights on affiliated airlines.  Id. ¶ 26.  American Airlines' records also tracked when employees traveled on American Airlines flights.  Id. ¶ 25.

Davis-Jackson was diagnosed with migraine headaches in 2012.  Id. ¶ 12; Pl.'s Resp. at 2.  On April 6, 2016, Davis-Jackson requested intermittent leave for menstrual migraines under American Airlines' FMLA policy.  Def.'s Facts ¶ 31; Pl.'s Resp. at 2; see also FMLA Certification Form, dated April 6, 2016 (attached as Ex. G to Def.'s Facts) [hereinafter "2016 Certification Form"]; FMLA Designation Letter, dated May 3, 2016 (attached as Ex. H to Def.'s Facts) [hereinafter "2016 Designation Letter"].  American Airlines approved Davis-Jackson's request for intermittent FMLA leave for one year, ending on April 5, 2017, during which she was permitted to use intermittent FMLA leave approximately two times per month and three days per episode.  Def.'s Facts ¶ 33; Pl.'s Resp. at 2; 2016 Designation Letter.  When her FMLA leave expired, Davis-Jackson submitted another FMLA certification from her physician, and American Airlines approved Davis-Jackson's renewed FMLA application for a second year, expiring April 5, 2018.  Def.'s Facts ¶ 35; Pl.'s Resp. at 5.  Davis-Jackson once again was permitted to use intermittent FMLA leave approximately two times per month and four days per episode.  Def.'s Facts ¶ 36; FMLA Designation Letter, dated April 13, 2017 (attached as Ex. J to Def.'s Facts).

On March 23, 2017, Vosko received a complaint from another American Airlines employee that Davis-Jackson was not in the Philadelphia area while on reserve duty and may have been misusing sick leave.  Def.'s Facts ¶ 37.  In response to the complaint, Vosko reviewed Davis-Jackson's schedule and flight history and created notes comparing the two.  Id. ¶ 38; Linda Vosko's Investigation Notes (attached as Ex. K to Def.'s Facts).  Based upon her review of American Airlines' flight records, Vosko concluded that there were multiple instances in

which Davis-Jackson could not have been within two hours of PHL for her reserve duty and was therefore ROB for multiple shifts. Def.'s Facts ¶¶ 39, 41. For example:

- Davis-Jackson was scheduled for reserve duty in Philadelphia on January 3 and 4, 2017. However, flight records indicated that on December 30, 2016, Davis-Jackson flew to Chicago, Illinois and did not fly again until she flew from Chicago to Dallas, Texas on January 5, 2017. Id. ¶¶ 42-43; Declaration of L. Vosko (attached as Ex. A to Def.'s Facts) [hereinafter "Vosko Decl."]; Davis-Jackson Flight History (attached as Ex. L to Def.'s Facts).

- Davis-Jackson was scheduled for reserve duty from 2:00 to 14:00 in Philadelphia on January 7, 2017. Davis-Jackson flew from Dallas to Chicago on January 6, 2017. However, American Airlines did not have any record of Davis-Jackson flying from Chicago to Philadelphia on January 6 or 7, 2017. On January 7, 2017, American Airlines attempted to assign Davis-Jackson to a flight as a reserve flight attendant. Within an hour of receiving the assignment, Davis-Jackson called in sick and requested to use FMLA leave. Def.'s Facts ¶¶ 44-48; Vosko Decl.; Davis-Jackson Flight History.

- On January 4, 2017, Davis-Jackson scheduled a standby ticket to travel from Chicago to Frankfurt, Germany (via Charlotte, North Carolina) on January 12, 2017, returning on January 17, 2017. Davis-Jackson was scheduled for reserve duty in Philadelphia beginning at 14:00 on January 11, 2017. On January 12, 2017, Davis-Jackson left from Chicago at 11:20 to fly to Germany. There was no record, however, of Davis-Jackson flying from Philadelphia to Chicago after her reserve duty shift concluded at 2:00 on January 12, 2017. Def.'s Facts ¶¶ 49-54; Vosko Decl.; Davis-Jackson Flight History.

- Davis-Jackson was also scheduled for reserve duty in Philadelphia from 14:00 to 2:00 on January 12 to January 13, 2017. Her flight from Chicago to Charlotte landed at 13:44 on January 12, 2017. At 14:04 on January 12, she called off for her reserve duty citing a personal emergency. Davis-Jackson then departed for her flight to Germany at 14:50. While in Germany, Davis-Jackson called off sick for her shifts on January 13 and 14, 2017, requesting to use FMLA leave. On January 17, 2017, at 14:50, she departed for Germany returning to Chicago. Def.'s Facts ¶¶ 55-60; Vosko Decl.; Davis-Jackson Flight History.

- From January 19 to January 22, 2017, Davis-Jackson was scheduled for reserve duty in Philadelphia. However, after landing in Chicago on January 17, 2017, American Airlines does not have any record of Davis-Jackson traveling to Philadelphia until January 23, 2017. Def.'s Facts ¶¶ 61-62; Vosko Decl.; Davis-Jackson Flight History.

- Davis-Jackson was scheduled for reserve duty in Philadelphia beginning at 14:00 on January 24, 2017. However, American Airlines' flight records showed that

4

Davis-Jackson left Philadelphia at 6:05 on January 24, 2017 to fly to Chicago. Def.'s Facts ¶¶ 63-64; Vosko Decl.; Davis-Jackson Flight History.

- Davis-Jackson was scheduled for reserve duty in Philadelphia on January 27, 28, and 29, 2017.  However, after Davis-Jackson flew to Chicago on January 24, 2017, American Airlines had no record of Davis-Jackson returning to Philadelphia until January 30, 2017.  Def.'s Facts ¶¶ 65-66; Vosko Decl.; Davis-Jackson Flight History.

- Davis-Jackson was scheduled for reserve duty in Philadelphia beginning at 14:00 on January 31, 2017.  However, on January 31, 2017, Davis-Jackson flew from Philadelphia to Chicago at 6:05.  Def.'s Facts ¶ 67; Vosko Decl.

- Davis-Jackson was scheduled for reserve duty shifts in Philadelphia from February 3 to 5, February 17 to 20, and February 26 to 28, 2017.  However, American Airlines' records indicate that Davis-Jackson flew from Charlotte to Chicago on February 3, 2017, and did not return to Philadelphia until March 13, 2017.  Although she was scheduled to fly to Philadelphia on February 28, 2017, she did not fly and called in sick for her shift.  Def.'s Facts ¶¶ 68-71; Vosko Decl.; Davis-Jackson Flight History.

- Comparing American Airlines' flight records and Davis-Jackson's scheduled shifts, Vosko determined that Davis-Jackson was likely ROB for her shifts on March 7, 14, 18, 21, 28 to 31, April 1 and 5, 2017.  Def.'s Facts ¶ 72; Vosko Decl.

After conducting this analysis that indicated that Davis-Jackson had violated American Airlines' policy for her reserve duty shifts, Vosko sent Davis-Jackson a letter on April 3, 2017, informing her of a mandatory meeting scheduled for April 10, 2017, to discuss allegations that Davis-Jackson was "Traveling While Sick."  Def.'s Facts ¶ 75; April 3, 2017 Letter from L. Vosko to S. Davis-Jackson (attached as Ex. N to Def.'s Facts).  Vosko rescheduled the meeting to April 26, 2017, after Davis-Jackson informed her that she had a doctor's appointment for April 10, 2017.  Def.'s Facts ¶ 76.  The meeting held on April 26, 2017 was attended by Vosko, Dante Jones (another American Airlines supervisor), Rick Cangey ("Cangey") (Davis-Jackson's union representative), and Davis-Jackson.  Id. ¶ 77.  At the meeting, Vosko told Davis-Jackson her concern that she was accepting credit for reserve shifts when American Airlines' flight records showed that Davis-Jackson was in Chicago and not Philadelphia.  Id. ¶ 79; Davis-

Jackson Dep. at 112-15.  Vosko requested that Davis-Jackson provide receipts showing that she was in Philadelphia for her reserve shifts.  Def.'s Facts ¶ 80; Davis-Jackson Dep. at 124.  When asked to explain why American Airlines' flight records did not show her commuting during her reserve duty shifts, Davis-Jackson said that her godfather sometimes bought her tickets on different airlines.  Def.'s Facts ¶ 88; Vosko Decl.; Notes from Dante Jones dated April 26, 2017 (attached as Ex. Q to Def.'s Facts) [hereinafter "D. Jones' Notes"].  However, Davis-Jackson was unable to provide any documentation of those flights, electronic or otherwise, explaining that everything was shredded.  Def.'s Facts ¶ 89; Vosko Decl.; D. Jones' Notes.  Although her godfather died on February 10, 2017, Davis-Jackson said any tickets bought after that time were purchased by her father's power of attorney.  Def.'s Facts ¶ 90; Vosko Decl.; D. Jones' Notes.  Davis-Jackson developed severe depression leading up to and following the death of her godfather.  Def.'s Facts ¶¶ 18-19; Pl.'s Resp. at 2-3.

At the meeting they also discussed Davis-Jackson's trip to Germany, which Davis-Jackson informed was a personal trip related to gathering items for her godfather's casket.  Def.'s Facts ¶¶ 81-87, 124; Davis-Jackson Dep. at 87-89, 93-94.  Although Davis-Jackson had already booked her return flight for five days later on January 17, 2017 when she booked her flight to Germany on January 4, 2017, see Vosko Decl., she claimed at the meeting that she did not book, or mistakenly booked, a return flight, and intended to return to the United States the same day as she arrived.  Def.'s Facts ¶¶ 84-86; D. Jones' Notes.  She further claimed that on the way to Germany, she became ill and was waiting until she recuperated before flying back to the United States.  Def.'s Facts ¶¶ 85, 126; Davis-Jackson Dep. at 93-94; D. Jones' Notes.

On April 26, 2017, Vosko sent Davis-Jackson a letter stating that she was placed on a paid disciplinary suspension pending the outcome of an investigation into allegations that she

was "Reserve Not Positioned for Duty."  Def.'s Facts ¶ 91.  In response to the meeting, Davis-

Jackson provided the following information:

- A letter dated May 7, 2017, stating that "I have attempted to retrieve any receipts for purchased airline tickets by my beloved father Attorney William Jakofsky. All documents and papers have been destroyed per his request within the first 30 days following his death or are in the process of being shredded." Id. ¶ 92; May 7, 2017 Letter from Davis-Jackson (attached as Ex. S to Def.'s Facts).

- A letter from Star Rios-Satchell dated May 8, 2017 stating that Davis-Jackson stayed at her home when "on call for work," but not identifying any particular dates in which she stayed at the home.  Def.'s Facts ¶¶ 93-94; May 8, 2017 Letter from Star Rios-Satchell (attached as Ex. T to Def.'s Facts).

- An attestation from Jonathan Borenstein, executor of Jakofsky's estate, which stated that he had "no personal knowledge of any payments, and any documents that may have shown payments, if made, are in the process of being shredded." Def.'s Facts ¶ 95; Attestation of Johnathan Borenstein (attached as Ex. U to Def.'s Facts).

- A receipt from a Minute Suites near the Philadelphia airport showing two purchases made there in March 2017, and three other purchases in 2018.  Def.'s Facts ¶ 96; Receipt (attached as Ex. V to Def.'s Facts).

- Notes from her sessions with American Airlines' Employee Assistance Program which showed that Davis-Jackson had spoken to the program providers on various dates in April 2016, April 2017, May 2017, and June 2017.  This documentation did not provide any information, however, regarding Davis-Jackson's physical location between December 2016 and April 2017.  Def.'s Facts ¶¶ 97-99; May 16, 2017 E-mail from Davis-Jackson to Vosko (attached as Ex. W to Def.'s Facts); Davis-Jackson Optum Records (attached as Ex. X to Def.'s Facts).

- A handwritten note in which she asserted that "[o]n January 12[, 2017], I took a personal day and flew to Germany with the intention to come back.  My flight over became very sick and called out sick 1-13-17 and 1-14-17.  When my health improved I flew back home." Def.'s Facts ¶ 101.

- Commendations from customers.  Id. ¶ 102

- A receipt for an iPhone with a handwritten note that she purchased a new phone because of problems with her old phone.  Id. ¶ 103.

Davis-Jackson did not provide any flight records, boarding tickets, or receipts for tickets

purchased that would show she had traveled to Philadelphia for the shifts that she was suspected

of being ROB.  Id. ¶ 104; Vosko Decl.; June 28, 2017 Letter from Vosko to Davis-Jackson (attached as Ex. M to Def.'s Facts) [hereinafter "June 28, 2017 Letter"].

On May 18, 2017, Vosko met with Davis-Jackson again, along with Cangey, Virendy Coates (Operations Manager, Flight Service), and Kim Kiswinkle (Union President, Philadelphia Base).  Def.'s Facts ¶ 106.  She was informed at the meeting and via letter that her suspension with pay was continued.  On June 28, 2017, American Airlines terminated Davis-Jackson's employment.  June 28, 2017 Letter.  Vosko concluded that Davis-Jackson "intentionally placed [herself] out of position for reserve duty on multiple occasions in 2016 and 2017 and that [she] accepted pay and credit for work [she] did not perform and did not intend to perform, as [she] was not available to fulfill any flight assignment."  Id.; Def.'s Facts ¶ 110.  Vosko did not find the explanations Davis-Jackson gave regarding flying on other airlines through tickets purchased by her godfather to get to Philadelphia credible, as Davis-Jackson was able to travel on American Airlines for free and received discounts from affiliated airlines, had used her employee flight privileges to fly to Germany, and had no paper or electronic documentation for other flights. Def.'s Facts ¶¶ 112-14; Vosko Decl.  Vosko also did not credit Davis-Jackson's explanation for her trip to Germany that she had intended to return the same day because records showed that she had reserved her flight to Germany for January 12, 2017, and her return ticket for January 17, 2017, on January 4, 2017.  Def.'s Facts ¶ 117; Vosko Decl.  She returned to Chicago using the ticket that she had booked on January 4, 2017.  Def.'s Facts ¶ 127; Vosko Decl.

Phone records obtained by American Airlines during litigation place Davis-Jackson in Illinois, not within two hours of PHL, during certain of her scheduled reserve shifts.  Def.'s Facts ¶¶ 139-40; AT&T Subpoena Response Excerpts (attached as Ex. CC to Def.'s Facts).

II.  **SUMMARY JUDGMENT STANDARD**

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

9

Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).  To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'"  Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

III. **DISCUSSION**

    A. **American Airlines is Entitled to Summary Judgment on Davis-Jackson's ADA Claim**

Davis-Jackson argues that her termination from American Airlines was a result of her severe depression and, therefore, was in violation of the ADA.  Pl.'s Resp. at 5-6.  Specifically, she claims that leading up to and after the death of her godfather on February 10, 2017, she experienced severe depression, "which adversely affected her ability to focus, to make rational decisions, and to work."  Id. at 3.  She argues that her termination did not take into account her mental health status and thus, violated the ADA.  Id. at 6.  American Airlines is entitled to summary judgment on this claim.

ADA discrimination claims are subject to the three-step burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  A plaintiff 's initial burden is to establish a prima facie case by showing that "'(1) he [or she] is a disabled person within the meaning of the ADA; (2) he [or she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he [or she] has suffered an otherwise adverse employment decision as a result of discrimination.'"  Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  Id. (citing 42 U.S.C. § 12112(b)(5)(A)).  If a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its decision.  McDonnell Douglas, 411 U.S. at 802.  If the defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason for termination was merely a pretext for intentional discrimination.  Id. at 804.

Applying these standards to Davis-Jackson's ADA discrimination claim, Davis-Jackson has failed to satisfy her burden of identifying any genuine issue of material fact demonstrating that she was terminated under circumstances raising a reasonable inference that her severe depression or other disability was a determining factor in her termination.  Even assuming that Davis-Jackson was able to satisfy her burden of establishing a prima facie case of discrimination, American Airlines articulated legitimate, non-discriminatory reasons for her termination – that Davis-Jackson was ROB on numerous occasions where she was not properly positioned or available for her reserve duty shifts and that she was suspected of misusing her FMLA leave. See Def.'s Mem. of Law in Support of Mot. for Summary Judgment (Doc. No. 78-1) at 5.  "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a non[-]discriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  An employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  Thus, American Airlines has satisfied its burden and the burden shifts to Davis-Jackson to prove that the stated reasons were pretextual.

In proving pretext, a plaintiff may survive a motion for summary judgment "by either (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765 (citations omitted). Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the purported] non-discriminatory reasons.'" Id. (emphasis in original) (citations omitted). Moreover, liability cannot be established based upon a factfinder's "mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the [factfinder's] *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370-71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis added)). Therefore, Davis-Jackson must present sufficient evidence to create a genuine factual dispute as to "both [whether] the employer's proffered explanation was false, and [whether] retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).

Davis-Jackson is unable to direct this Court to any evidence that discredits American Airlines' proffered legitimate, nondiscriminatory reasons for her termination on the grounds that she was ROB on numerous occasions and that she misused her FMLA leave.  The investigation into Davis-Jackson's travel history and reserve duty schedules was prompted by a complaint Vosko received on March 23, 2017 from another American Airlines employee that Davis-Jackson was not in the Philadelphia area while on reserve duty and may have been misusing sick leave.  Def.'s Facts ¶ 37.  In response to this complaint, Vosko initiated an investigation comparing Davis-Jackson's schedule as a Reserve Duty Flight Attendant and flight history, which American Airlines tracked for all its employees.  Id. ¶ 38.  As a Reserve Duty Flight Attendant, Davis-Jackson needed to be within two hours of PHL for any of her scheduled shifts.  Id. ¶ 23; Dep. of Davis-Jackson at 37.  However, based on Vosko's review of Davis-Jackson's flight history in comparison to her scheduled shifts, it appeared to Vosko that Davis-Jackson was well outside the Philadelphia area, most notably in the Chicago area where she resided, and, therefore, not positioned for duty for many of her scheduled shifts between December 2016 and April 2017.  See Def.'s Facts ¶¶ 39-72.  Nevertheless, Davis-Jackson accepted pay and credit for work when it did not appear that she was actually available to fulfill her flight assignments.  Id. Moreover, during this time period, it appeared to Vosko that when American Airlines asked Davis-Jackson to report to duty, Davis-Jackson had called in sick and requested to use her intermittent leave under the FMLA.  Id. ¶¶ 44-48, 55-60, 68-71.  For example, Davis-Jackson called in sick requesting to use FMLA leave within an hour of receiving an assignment for her reserve duty shift on January 7, 2017, even though American Airlines' flight records indicated that she was in Chicago at the time.  Id. ¶¶ 44-48.  Furthermore, although scheduled for reserve duty in Philadelphia on January 12, 2017, she called off citing a personal emergency at the start

of her shift when flight records indicated she was in Charlotte, and then subsequently called off sick requesting to use FMLA leave for her shifts on January 13 and 14, 2017, while she was in Germany.  Id. ¶¶ 55-60.

After coming to an initial conclusion that Davis-Jackson was ROB and had misused FMLA leave based on her comparison of Davis-Jackson's scheduled shifts and flight records, Vosko informed Davis-Jackson of a mandatory meeting, which was rescheduled to accommodate Davis-Jackson's doctor's appointment.  Id. ¶¶ 75-76.  At the meeting she was asked to explain these discrepancies between her Reserve Duty Flight Attendant Schedule and flight history.  Id. ¶¶ 79-80.  In response, Davis-Jackson informed Vosko that her godfather, who had then recently passed away, had purchased tickets for her on other airlines so she could commute to Philadelphia for her shifts, so American Airlines would have no record of many of her flights to Philadelphia.  Id. ¶ 88.  She also explained that, for any flights occurring after he passed away on February 10, 2017, tickets were purchased by the godfather's power of attorney.  Id. ¶ 90.  Vosko ultimately did not credit this explanation based on the fact that Davis-Jackson flew for free on American Airlines, received discounts from other affiliated airlines as an employee, could not provide any documentation, electronic, paper, or otherwise, showing that she had flown on other airlines to be positioned for her shifts, and that she used her employee flight benefits for other flights, including a January 2017 trip to Germany.  Id. ¶¶ 112-14.  Moreover, Vosko did not credit the explanation provided by Davis-Jackson surrounding her trip to Germany in January 2017.  Id. ¶ 117.  Although Davis-Jackson claimed that she had only intended to go to Germany for a one-day trip on January 12, 2017 to retrieve an item for her godfather and immediately return, Vosko noted that on January 4, 2017, Davis-Jackson scheduled both an outgoing flight to

Germany for January 12, 2017, and a return flight five days later, which was the flight she indeed returned on.  Id. ¶ 127.

Finally, Vosko provided Davis-Jackson an opportunity to submit documentation that would demonstrate that she was, in fact, properly positioned within two hours of Philadelphia during the reserve shifts where it appeared that she was elsewhere.  Id. ¶ 80.  The documentation submitted by Davis-Jackson, however, did not provide any corroboration that she was positioned for duty for the dates and shifts Vosko identified as being at issue.  Id. ¶¶ 92-103.

Davis-Jackson has not put forth any evidence creating a genuine issue of material fact that Vosko's decision to terminate Davis-Jackson was pretextual and that the real reason for her actions was discrimination based on Davis-Jackson's depression or any other alleged disabilities.  Davis-Jackson claims that she was in the midst of severe depression during the investigation, leading to her inability to provide details regarding her flight schedules and shifts.  Pl.'s Resp. at 3.  Although she asserts that she "was not ROB for dozens of scheduled shifts between December 2016 and April 2017," id. at 9, she provides no evidence undermining Vosko's conclusions.  Instead, she claims that "many of the alleged days Davis-Jackson showed as scheduled for a trip were not actually scheduled due to "computer glitches."  Id. at 10; see also id. at 2.  In support of her purported argument that American Airlines' malfunctioning scheduling system may have accounted for it appearing that she was ROB, she attaches two online articles – a Forbes article entitled "American Airlines Computer Program Botches Flight Attendant Holiday Schedules" dated November 28, 2015 and a 2018 Business Insider article entitled "American Airlines says it has fixed the computer glitch that forced its regional airline to cancel more than 2,000 flights."  See Pl.'s Resp. Ex. A.  These articles do not create any issue of disputed fact.  In addition to being inadmissible hearsay, see, e.g., Lawler v. Richardson, No. 10-

196, 2012 WL 2362383, at *2 (E.D. Pa. June 20, 2012) (magazine and "[n]ewspaper articles are generally considered hearsay, and may only be used during trial in exceptional circumstances"), these articles do not support Davis-Jackson's claims.  A 2015 article wherein flight attendants were awarded trips they did not want to work has no bearing on whether Davis-Jackson was ROB on scheduled shifts from December 2016 through April 2017.  See Pl.'s Resp. Ex. A. Moreover, an article that describes a "computer glitch" in June 2018 that resulted in the cancellation of flights for a regional airline carrier, PSA Airlines, see id., bears no relationship to Davis-Jackson's termination from American Airlines in June 2017.  Regardless, "[b]ecause the ultimate question is whether discriminatory animus determined the employer's action, an employee cannot discredit the employer's proffered reason simply by showing that the employer's decision was 'wrong or mistaken.'"  Gardner v. Sch. Dist. of Phila., 636 F. App'x 79, 86 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 765).

Davis-Jackson also argues that she should have been subject to progressive discipline versus termination, that she should have been contacted about her policy violations before the investigatory meetings, and that the letter informing her of the investigatory meeting was misleading because it referred to "Traveling While Sick" and not suspicion of being ROB.  Pl.'s Resp. at 5.  Regardless, "[w]hether she was told previously [of complaints regarding her job performance] is irrelevant" in establishing pretext.  Nyamekye v. Penn Hills Sch. Dist., No. 2:15cv1219, 2017 WL 4023352, at *5 (W.D. Pa. Sept. 13, 2017).  None of Davis-Jackson's criticisms with how Vosko conducted the investigation demonstrate that Vosko was motivated by Davis-Jackson's severe depression or any other alleged disabilities in her decision to terminate her employment.  See Fuentes, 32 F.3d at 765 ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise,

shrewd, prudent, or competent."). Likewise, Davis-Jackson's employment commendations, see Pl.'s Resp. Ex. G, do not discredit Vosko's decision to terminate her. See, e.g., Steward v. Sears, Roebuck & Co., 231 F. App'x 201, 210 (3d Cir. 2007) ("A plaintiff does not establish pretext by pointing to commendation[s] . . . in categories the defendant says it did not rely upon in making the employment decision at issue.").

Davis-Jackson has not provided any evidence "that would allow a reasonable jury either to disbelieve [American Airlines'] non[-]discriminatory and non-retaliatory reasons for terminating her, or to believe that any discriminatory or retaliatory animus would have 'had a determinative effect' on her termination." Oden v. SEPTA, 671 F. App'x 859, 862 (3d Cir. 2016). "[T]o avoid summary judgment, [Plaintiff's] evidence rebutting the [Defendant's] proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment actions." Fuentes, 32 F.3d at 764 (emphasis in original). Here, Davis-Jackson has failed to do so.

For the foregoing reasons, this Court concludes that Davis-Jackson has not put forth evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in American Airlines' reasons for terminating her, such that "a reasonable factfinder could rationally find them unworthy of credence and, hence, infer that the [American Airlines] did not act for the asserted non-discriminatory reasons." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010) (quoting Fuentes, 32 F.3d at 764-65). Accordingly, American Airlines is entitled to summary judgment on Davis-Jackson's claim of discrimination under the ADA.

**B.      American Airlines is Entitled to Summary Judgment on Davis-Jackson's FMLA Claim**

Davis-Jackson asserts that American Airlines violated the FMLA by terminating her employment in retaliation for her exercise of her FMLA rights in taking leave.[2]  Pl.'s Resp. at 8. American Airlines is entitled to summary judgment on this claim.

The FMLA prohibits an employer from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c); see also id. § 2615(a)(2).  As with Davis-Jackson's ADA claims, FMLA retaliation claims are analyzed under the burden-shifting framework established in McDonnell Douglas.  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).  To make out a prima facie case of FMLA retaliation, a plaintiff must establish that: (1) he or she invoked his or her right to FMLA-qualifying leave; (2) he or she suffered an adverse employment decision; and (3) the adverse action was causally related to his or her invocation of rights.  Id.  If a plaintiff can make this showing, the burden of production then shifts to the defendant to "'articulate some legitimate, non[-]discriminatory reason' for its decision."  Id. (quoting McDonnell Douglas, 411 U.S. at 802).  If the defendant meets this "minimal burden," the plaintiff must then show that this proffered justification is mere pretext for retaliation by

---

[2]      American Airlines argues that it is entitled to summary judgment on any FMLA claim asserted by Davis-Jackson in her response because she did not assert an FMLA claim in her Amended Complaint.  Def.'s Reply (Doc. No. 80) at 3.  When Davis-Jackson filed her Amended Complaint, she was proceeding pro se.  See Am. Compl. (Doc. No. 10).  In her Amended Complaint, she specifically brings claims pursuant to the ADA and Title VII.  Id. at 2.  She also referenced that "Vosko stated to me that she looks at my family medical leave of absence as a pattern to her" and "disregarded [her] FMLA in which [she] was approved for intermittent leave."  Id. at 3.  Giving Davis-Jackson every benefit of the doubt based on her pro se status at the time of filing the Amended Complaint, she arguably asserts a claim pursuant to the FMLA. Nevertheless, as discussed infra, American Airlines is entitled to summary judgment on this claim.

"point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the defendant's] articulated legitimate reasons." Id. (quoting Fuentes, 32 F.3d at 764).[3]

Even assuming that Davis-Jackson made out a prima facie case of FMLA retaliation, once again, American Airlines identified legitimate, non-discriminatory reasons for her termination, discussed supra in Section III.A., such as multiple suspected incidents of ROB and suspected misuse of FMLA leave.  Misuse of FMLA leave is a legitimate, non-retaliatory reason for termination.  Beishl v. Cnty. of Bucks, No. 18-2835, 2018 WL 6812132, at *25 (E.D. Pa. Sept. 17, 2019) (holding that an employee fired for misusing FMLA leave could not establish a FMLA retaliation claim); Capps, 847 F.3d at 152-53 ("FMLA retaliation claims require proof of the employer's retaliatory intent . . . . Where an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate non[-]discriminatory justification for the discharge.").

Davis-Jackson's attempts to either discredit American Airlines' reasons for her termination, or demonstrate that retaliation was in fact a motivating cause of her termination, ultimately fail.  Fuentes, 32 F.3d at 764.  In her opposition, Davis-Jackson argues that she used her FMLA leave when she felt unable to work due to her severe depression.  Pl.'s Resp. at 9.

---

[3]    To establish a claim for interference under the FMLA, a plaintiff must establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."  Capps v. Mondelez Global, LLC, 847 F.3d 144, 155 (3d Cir. 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014)).  Here, Davis-Jackson does not claim that she was denied FMLA benefits or had any of her requests for FMLA leave rejected.

However, Davis-Jackson was approved for FMLA leave from April 2016 through April 2017 for menstrual migraines, not depression.  See 2016 Designation Letter; 2016 Certification Form. Accordingly, use of FMLA leave for a purpose other than the approved use for menstrual migraines was not for "the intended purposes of leave" and did not entitle her to FMLA protection.  29 U.S.C. § 2614.  Davis-Jackson also argues that, because she was permitted to renew her intermittent FMLA from April 2017 to April 2018, she could not have been abusing her FMLA status.  Pl.'s Resp. at 2, 5, 8.  However, "[t]he FMLA does not shield an employee from termination simply because the alleged misconduct concerns use of FMLA leave."  Parker v. Verizon Pennsylvania, Inc., 309 F. App'x 551, 563 (3d Cir. 2009); see also Wawars v. City of Plainfield, 489 Fed. App'x 585, 588 (3d Cir. 2012) ("The FMLA ... does not prohibit the termination of an employee who abuses her leave . . . .").  "Just as suspected fraud or violation of company policy would be a sufficient basis to discharge an employee not on FMLA leave, it is a sufficient basis to discharge one who misuses FMLA leave."  Parker, 309 F. App'x at 563. Ultimately, Davis-Jackson herself acknowledges that her termination was based upon Vosko's "subjective belief that Davis-Jackson was abusing her intermittent FMLA."  Pl.'s Resp. at 8. American Airlines' "honest suspicion that [Davis-Parker] misused [her] leave prevents it from being found liable for violating the FMLA."[4]  Parker, 309 F. App'x at 563.

---

[4]    In support of her claims, Davis-Jackson also attaches articles related to a 2019 lawsuit filed by the New York City's Department of Consumer and Worker Protection alleging a violation of New York City's Paid Sick Leave Ordinance.  See Pl.'s Resp., Ex. H.  For the reasons discussed supra in Section III.A., these articles constitute hearsay and do not create a genuine issue of material fact as to whether Vosko's decision to terminate Davis-Jackson was in retaliation for her use of FMLA leave.  See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").  Notwithstanding their inadmissibility, these articles bear no relation to

(Footnote continued on next page)

20

The record in this matter is devoid of any evidence of pretext.  In contrast, the undisputed facts support American Airlines' honest belief that Davis-Jackson was ROB on multiple occasions and misused her FMLA leave when she was scheduled for reserve duty shifts. Accordingly, American Airlines is entitled to summary judgment on Davis-Jackson's FMLA claim.

### C.   American Airlines is Entitled to Summary Judgment on Davis-Jackson's Title VII Claim

In an employment discrimination case where no direct evidence of intentional discrimination is present, as is the case here, this Court must apply the burden-shifting test established by the Supreme Court in McDonnell Douglas.  Under this framework, the plaintiff has the initial burden of establishing a prima facie case of racial discrimination by pointing to evidence in the record sufficient to create a genuine factual dispute that "s/he suffered an adverse employment action . . . under circumstances that could give rise to an inference of intentional discrimination" on the basis of race.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  To show a prima facie case of racial discrimination, a plaintiff must demonstrate that: "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he [or she] sought to retain; (3) the plaintiff suffered an adverse employment action, . . . and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination."  Green v. V.I. Water & Power Auth., 557 F. App'x 189, 195 (3d Cir. 2014).  To establish the fourth element, a plaintiff may either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected

_____

Davis-Jackson's claims as she did not work in New York City and was not subject to the ordinance at issue.

class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his [or her] membership in a protected class and the adverse employment action."  Id.  A plaintiff's subjective belief that race played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination.  Wilson v. Blockbuster, Inc., 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008) (citing Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)).

In her opposition, Davis-Jackson concedes that she has set forth no evidence that could support a claim of racial discrimination under Title VII.  Pl.'s Resp. at 10.  At most, she states without any support that she "was informed by a union representative that American Airlines was targeting African American employees."  Id. at 6, 10.  This completely vague statement is insufficient to create a genuine issue of material fact regarding racial discrimination.[5] Accordingly, American Airlines is entitled to summary judgment on this claim.

## IV.   CONCLUSION

For the reasons discussed above, American Airlines will be granted summary judgment as to all of Davis-Jackson's claims in this action.  An appropriate order follows.

Dated: February 23, 2022

---

[5]   Davis-Jackson attributes this lack of evidence due to her former pro se status during what she claims was the "majority" of the litigation.  Pl.'s Resp. at 10.  However, Davis-Jackson was appointed counsel on February 11, 2019, see Doc. No. 22, was represented by counsel throughout discovery, and only became pro se at the conclusion of discovery, see Doc. No. 50. Davis-Jackson had ample opportunity to establish facts during discovery that could support a racial discrimination claim, but did not.

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE